Roberta **BUGENIG, Plaintiff–Appellant,**

v.

**HOOPA VALLEY TRIBE; The Hoopa Valley Tribal Council; The Tribal Court of the Hoopa Valley Tribal Reservation; Byron Nelson, Jr., Honorable Judge of the Hoopa Valley Tribal Court; Merv George, Chairman of the Hoopa Valley Tribal Council, Defendants–Appellees.**

No. 99–15654.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 18, 2000

Filed Oct. 3, 2000

1212

James S. Burling (argued), Pacific Legal Foundation, Sacramento, California, for the plaintiff-appellant.

Thomas P. Schlosser (argued), K. Allison McGaw, Morriset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for the defendants-appellees.

Ethan G. Shenkman, Anne R. Traum, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Sandra J. Ashton, Office of the Solicitor, United States Department of the Interior, Washington, D.C., for amicus United States of America.

Before: REAVLEY,[1] O'SCANNLAIN, and GOULD, Circuit Judges.

1. The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United

O'SCANNLAIN, Circuit Judge:

This case presents questions of Indian law regarding the scope of tribal jurisdiction over the activities of nonmembers: specifically, to what extent can the tribe regulate land use of fee-patented private property within a reservation boundary?

I

In 1864, the Superintendent of Indian Affairs set aside the Hoopa Valley and its adjacent mountains, located in northwestern California, as the Hoopa Valley Indian Reservation. The boundaries of the original reservation, defined by statute in 1876, were subsequently extended by executive order in 1891. The expanded reservation was occupied jointly by the Hoopa Indians and a group of non-Hoopa Indians. This arrangement led to numerous disputes, and a great deal of litigation, over the proper allocation of political authority and reservation income (primarily from the sale of timber) between the two groups. *See Short v. United States*, 228 Ct.Cl. 535, 661 F.2d 150, 151–53 (1981) (describing the history of the Hoopa Valley Indian Reservation and the disputes between the Hoopa and non-Hoopa Indians); *Puzz v. United States*, No. C80–2908–THE, 1988 WL 188462, at *1–2 (N.D.Cal. April 8, 1988) (same).

Congress attempted to resolve these conflicts through passage of the Hoopa–Yurok Settlement Act of 1988, 25 U.S.C. §§ 1300i–1300i–11 ("the Settlement Act"). The Settlement Act partitioned the expanded reservation into two parts: (1) the original reservation as defined in 1876, which was set aside as the Hoopa Valley Indian Reservation ("the Reservation"); and (2) the extension added in 1891, which was set aside as a reservation for a newly recognized tribe of non-Hoopa Indians called the Yurok Tribe. *See id.* § 1300i–1 (partitioning the expanded reservation); *id.* § 1300i–8 (recognizing the Yurok Tribe). The Settlement Act also provided

that (1) "[t]he existing governing documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary [of the Interior], are hereby ratified and confirmed," *id.* § 1300i–7; and (2) the "status as an Indian tribe" of the newly recognized Yurok Tribe "is hereby ratified and confirmed," *id.* § 1300i–8(a)(1).

The Hoopa Valley Tribe ("the Tribe") is a federally-recognized Indian tribe. The Tribe is organized under a constitution and amendments approved by the Secretary of the Interior and is governed by the Hoopa Valley Tribal Council ("Tribal Council"), pursuant to the Hoopa Valley Tribal Constitution.

Every other summer, the Tribe holds its well-known White Deerskin Dance, a ten-day dance dedicated to "world renewal." The dance is a public event imbued with cultural, social, and religious significance for the Tribe. The dance, which is accompanied by feasting and celebration, takes place at the sacred White Deerskin Dance Site ("the Site") on Bald Hill, as well as at four other locations throughout the Reservation.

On January 28, 1995, after providing notice to affected land owners and holding public hearings, the Tribal Council adopted a forest management/timber harvest plan prohibiting all logging within a half-mile buffer zone around the Site and the trail leading to it. The Tribal Council justified its action by citing the need to preserve the integrity and sanctity of the Site. The establishment of the buffer zone was approved by the Bureau of Indian Affairs.

Roberta Bugenig is a nonmember of the Tribe and a non-Indian whose ancestors migrated to the Hoopa Valley area approximately 150 years ago. On March 22, 1995, shortly after establishment of the half-mile buffer zone around the Site, Bugenig purchased in fee simple forty acres of land located within the Reservation's external boundaries and the buffer zone.

States Court of Appeals, Fifth Circuit, sitting by designation.

Non–Indians such as Bugenig own less than three percent of the land within reservation boundaries.

Bugenig sought to harvest some second-growth timber on less than three acres of her forty-acre parcel in order to help pay for the construction of her retirement residence. On June 19, 1995, Bugenig applied to the State of California ("the State") for a logging permit to harvest trees selectively on her land. Also on June 19, Bugenig appeared before the Tribal Council to request a hauling permit to transport harvested timber on a tribal road running over reservation land. The Tribal Council denied her request for a hauling permit.

After receiving a logging permit from the State in early July 1995, Bugenig sent a check for $140 to the Tribal Council on July 24, 1995, as intended payment for a hauling permit. On July 26, Bugenig began cutting down and harvesting trees on her land. On July 28, the Tribal Council returned Bugenig's check and ordered her to cease and desist from logging inside the buffer zone.

On August 3, 1995, the Tribe filed suit against Bugenig in the Hoopa Valley Tribal Court ("Tribal Court"), seeking injunctive relief and damages resulting from her logging activities in violation of the forest management plan. The Tribal Court issued a temporary restraining order that same day, followed a week later by a preliminary injunction barring Bugenig from harvesting timber on her land. On October 10, 1995, the State revoked Bugenig's logging permit, explaining that "no timber operations are allowed on significant historical or archeological sites [defined as] sites that have significant or religious importance to California Indians."

On July 11, 1996, the Tribal Court held that the Tribe has jurisdiction over Bugenig's land, and it permanently enjoined her from harvesting timber in the buffer zone. The Tribal Court also ordered Bugenig to clean her property, to cooperate with the Hoopa Valley Tribal Forestry Department in developing a reforestation plan, and to pay the Tribe's costs. Bugenig was subsequently found in contempt for failing to comply with the Tribal Court's order.[2]

Bugenig appealed the Tribal Court's decision to the Northwest Regional Tribal Supreme Court ("Tribal Supreme Court"). On April 23, 1998, the Tribal Supreme Court affirmed the Tribal Court's holding that the Tribe has jurisdiction over Bugenig's activities and her land. The Tribal Supreme Court based its decision on (1) the second exception to the main rule of *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981);[3] and (2) the Settlement Act.

On September 4, 1998, having exhausted her remedies within the tribal court system, Bugenig filed suit in federal court against the Tribe and various tribal defendants. Bugenig sought declaratory and injunctive relief against the Tribe's exercise of regulatory jurisdiction over her land use and the tribal courts' exercise of adjudicatory jurisdiction over her disputes with the Tribe. The Tribe filed a motion

**2.** The Tribal Court's injunction remains in effect, and a lien has been placed on Bugenig's property for the collection of the Tribal Court's $100 fine for contempt. The State's revocation of Bugenig's logging permit does not render this case moot, because it is possible that Bugenig will apply for a new logging permit and begin to harvest timber on her property if the injunction is lifted. *See Allee v. Medrano,* 416 U.S. 802, 810, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).

**3.** As discussed *infra,* the first *Montana* exception permits certain tribal regulation of "the activities of nonmembers who enter consensual relationships with the tribe or its members," while the second exception authorizes tribal jurisdiction over nonmember conduct when such conduct "threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." 450 U.S. at 565–66, 101 S.Ct. 1245. The Tribal Supreme Court reversed a portion of the Tribal Court's decision finding the first *Montana* exception applicable and affirmed as to the applicability of the second exception.

to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The district court granted the Tribe's motion to dismiss. The district court held that through passage of the Settlement Act, which "ratified and confirmed" tribal governing documents that assert tribal jurisdiction over nonmembers, Congress conferred upon the Tribe the authority to regulate Bugenig's land. Because it found express congressional authorization for the Tribe's exercise of jurisdiction, the district court did not reach the issue decided by the tribal courts regarding the Tribe's claim of inherent authority to regulate under the second *Montana* exception.

Bugenig filed this timely appeal.[4]

## II

■ We begin by addressing whether the relevant section of the Settlement Act relied upon by the Tribe and the district court constitutes an "express authorization by federal statute or treaty [of] tribal jurisdiction over the conduct of nonmembers." *Strate v. A–1 Contractors*, 520 U.S. 438, 445, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).

### A

The statutory provision at issue provides, in full, as follows: "The existing governing documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary, are hereby ratified and confirmed." 25 U.S.C. § 1300i–7.

The fact that nothing in the Settlement Act itself explicitly confers upon the Tribe jurisdiction to regulate nonmembers raises serious questions as to how carefully Congress considered whether it was making any grant of regulatory authority to the Tribe. Moreover, the Settlement Act uses the same "ratified and confirmed" language to recognize the newly created Yurok Tribe, 25 U.S.C. § 1300i–8, which suggests that this language may simply represent Congress's attempt to establish the Hoopa Valley Tribe and the Yurok Tribe as the governing authorities for their respective reservations, rather than a consciously made delegation of authority to the tribes to exercise jurisdiction over nonmembers. Indeed, legislative history makes clear that Congress's overriding concern in passing the Settlement Act was ending the acrimonious disputes between the Hoopa and non-Hoopa Indians living in the Hoopa Valley by creating two separate reservations, one for the Hoopa and one for the Yurok, in which each group would be free to govern itself without interference from the other. *See, e.g.,* 134 Cong. Rec. S13967–02, 1988 WL 177595, at \*34 (Sept. 30, 1988) (statement of Sen. Inouye) (explaining the Hoopa Tribe's loss of its ability to govern the area that ultimately became its exclusive reservation); 134 Cong. Rec. H9406–01, 1988 WL 176807, at \*35 (Oct. 3, 1988) (statement of Rep. Bosco) (explaining the Settlement Act as "lay[ing] the groundwork for strong, healthy tribal communities"). The legislative history contains no indication that Congress considered giving or intended to give the Tribe authority to exercise jurisdiction over fee-patented land owned by non-Indians such as Bugenig.

Despite this ambiguity with respect to the Settlement Act as a grant of power over tribal nonmembers, the district court interpreted § 1300i–7 as a congressional delegation of authority to the Tribe to exercise such jurisdiction. The district court reasoned that § 1300i–7's "ratified and confirmed" language works to "give[ ] every clause in the document being ratified the full force and effect of a congressional statute." Turning to the Tribe's governing

---

4. The United States, which did not participate in the district court proceedings, submitted an amicus curiae brief urging affirmance based on inherent tribal authority pursuant to the second *Montana* exception. The motion of the United States for an extension of time to file an amicus brief, construed as a motion for leave to file an untimely amicus brief, is granted.

documents, the district court looked to Article III of the Tribal Constitution, which provides that the Tribe has jurisdiction over "all lands within the confines of the Hoopa Valley Indian Reservation boundaries as established by Executive Order of June 23, 1876, and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians." The district court held that "under the plain language of Article III, the Hoopa Valley Tribe has jurisdiction over Bugenig's land" as land located within the boundaries of the reservation.

There is, however, a competing plausible interpretation of the Tribal Constitution. Bugenig, relying upon language in the Tribal Constitution asserting tribal jurisdiction over "such other lands as may hereafter be acquired by or for the Hoopa Valley Indians," argues that "other lands" should be read as referring only to "fee lands not presently owned by the tribe— land outside the reservation boundaries and land such as Mrs. Bugenig's fee property." In other words, the district court's and Tribe's broad reading of "all lands" within reservation boundaries would render superfluous the reference to "such other lands as may hereafter be acquired by or for the Hoopa Valley Indians." Bugenig's interpretation also appears viable.

The district court additionally relied upon Article IX of the Tribal Constitution. This provision provides that the Tribal Council, "subject to any limitations imposed by Federal statutes or by the Constitution of the United States," shall have the power "[t]o safeguard and promote the peace, safety, morals, and general welfare of the Hoopa Valley Indians by regulating the conduct of trade and the use and disposition of property upon the reservation, provided that any ordinance directly affecting non-members of the Hoopa Valley Tribe shall be subject to the approval of the Commissioner of Indian Affairs or his authorized representative." The wording of this provision, which links "conduct of trade" with the "use and dis-position of property," suggests that it merely represents the Tribe claiming for itself the power to regulate consensual commercial dealings between tribal members and nonmembers under the first exception to *Montana*'s main rule. The district court, however, simply accepted the tribal courts' interpretation of this language as a jurisdictional grant, based on a tribal court's power to determine the purpose, scope, and operative effect of its own constitution.

It is worth noting that nothing in Article IX affirmatively grants or expressly claims tribal authority to regulate nonmember activity; rather, in recognizing the possibility of a tribal ordinance "directly affecting" nonmembers, the provision is at best an implicit grant of power. Furthermore, as Bugenig points out, the provision could also be easily viewed as "refer[ring] to in personam jurisdiction over non-Indians within the reservation, an interpretation that would be consistent with the presumption against tribal regulatory jurisdiction over non-Indian fee lands." *Cf. County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 264–65, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (contrasting in rem jurisdiction over fee-patented land within reservation boundaries with in personam jurisdiction over nonmembers on the reservation). In short, to the extent that Articles III and IX are not free of ambiguity, the Tribal Constitution's status as a grant of authority to the Tribe is less than perfectly clear.

### B

As the foregoing discussion indicates, there are plausible arguments on both sides as to whether the Settlement Act confers upon the Tribe the jurisdiction to regulate the activities of nonmembers. There is a reasonable case to be made for finding congressional authorization of tribal jurisdiction, but the case is by no means airtight. There is before us language that potentially, but not definitively, carries out

a delegation of authority. We are thus confronted with the following question: What standard should be employed for evaluating the sufficiency of a claimed delegation of congressional authority to a tribe to regulate the activities of nonmembers?

■ Strate requires "express authorization" for an Indian tribe to exercise authority over nonmembers, 520 U.S. at 445, 117 S.Ct. 1404; we have not yet had the occasion to address in detail how "express" this delegation must be. In *Burlington Northern Railroad Co. v. Red Wolf*, 196 F.3d 1059 (9th Cir.1999), *cert. denied sub nom. Estates of Red Wolf & Bull Tail v. Burlington Northern Railroad Co.*, — U.S. ——, 120 S.Ct. 1964, 146 L.Ed.2d 795 (2000), we touched upon the question, but only briefly. In *Red Wolf*, the estates of two Indians killed in an accident between a train and an automobile on a right-of-way granted by Congress to a railroad claimed that a tribal court had civil jurisdiction over their wrongful death actions. The estates attempted to argue that two statutes delegated to the tribe jurisdiction over the right-of-way: (1) the congressional grant of the right-of-way, which directs that the "operation of such railroad shall be conducted with due regard for the rights of the Indians"; and (2) the Indian Tribal Justice Support Act of 1993, which provides assistance for building tribal justice systems. *Id.* at 1064. We rejected these arguments for inferred grants of jurisdiction, holding simply that "[t]ribal jurisdiction over nonmembers on land subject to *Montana*'s main rule requires express congressional authorization. Neither statute contains it." *Id.*

■ The above discussion from *Red Wolf* demonstrates that we are reluctant to find the requisite congressional authorization through implication from statutes that do not explicitly speak in terms of delegating authority.

As for guidance from the Supreme Court and other courts, the relevant prece-

dents are few, in part because "[t]here are few examples of congressional delegation of authority to tribes." Felix S. Cohen, *Handbook of Federal Indian Law* 253 (1982). In *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Supreme Court concluded that 18 U.S.C. § 1161 constitutes a valid and express delegation to tribes of the authority to regulate the distribution of alcoholic beverages on reservations. In *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), the Supreme Court reaffirmed this view of § 1161. That these are the only two cases in which the Supreme Court has squarely confronted and expressly found congressional delegation of authority to tribes suggests the extraordinary nature of such grants of power.

In *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 433, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (White, J.) (plurality opinion), Justice White cited the following examples of express statutory delegations of power to Indian tribes: 18 U.S.C. § 1151, 18 U.S.C. § 1161, and 33 U.S.C. § 1377(e), (h)(1). The specific language of these provisions merits careful consideration. Section 1161 gives tribes power to make laws regarding liquor sales in "Indian country," which is defined as including "all land within the limits of any Indian reservation under the jurisdiction of the United States government, *notwithstanding the issuance of any patent*, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151 (emphasis added). Section 1377(e) allows tribes to be treated as states under the Clean Water Act in setting water standards for federal Indian reservations, with the term "federal Indian reservation" defined as "all land within the limits of any Indian reservation under the jurisdiction of the United States government, *notwithstanding the issuance of any patent*, and including rights-of-way running through the reservation." 33 U.S.C. § 1377(h) (emphasis added). It is worth noting, then, that the delegations of congressional authority to Indian tribes that

have been recognized by the Supreme Court all employ the same standard language to achieve delegation, giving Indian tribes authority over all land within the geographical boundaries of the reservation, "notwithstanding the issuance of any patent." This recognized delegation language is conspicuously absent from the Settlement Act section relied upon by the Tribe.

In terms of evaluating the significance of this omission, we find highly persuasive the treatment of a similar omission in statutory language in *Arizona Public Service Co. v. EPA*, 211 F.3d 1280, 1300 (D.C.Cir. 2000) (Ginsburg, J., concurring in part and dissenting in part). In *Arizona Public Service*, the D.C. Circuit was called upon to determine whether 42 U.S.C. § 7601(d)(2)(B), a provision of the Clean Air Act, delegates to Indian tribes the authority to enforce the Clean Air Act on nonmember fee-owned land within a reservation. A majority of the court upheld the provision as a delegation based on its review of specific language in the statute that it found to establish an express delegation, *see* 211 F.3d at 1287–92; Judge Ginsburg dissented in part.

In his thorough and well-reasoned opinion, Judge Ginsburg expressed the view that § 7601(d)(2)(B) contains no express delegation of authority to tribes. He began by noting the general rule that because "an Indian tribe lacks inherent authority to regulate the conduct of a nonmember on land he owns within the boundaries of the tribe's reservation," a tribe may exercise such authority only by "*express* congressional delegation." *Id.* at 1300 (quoting *Montana*, 450 U.S. at 564, 101 S.Ct. 1245) (emphasis added). Turning to the language of § 7601(d)(2)(B), he found it insufficient to establish such a delegation, in large part because of its failure to employ the "notwithstanding the issuance of any patent" language that "has been a feature in the only two cases in which the Supreme Court has found an express delegation of

authority to tribes," namely, *Mazurie* and *Rice*. 211 F.3d at 1301–02. He offered the following analysis:

> One important indication that the Congress did not intend this phrase as an express delegation is that it used the Court tested "notwithstanding" provision in [42 U.S.C. § 7410(*o*) ] but not in [§ 7601(d)(2)(B) ]. .... I do not believe that the Congress, obviously aware that it could enlarge tribal authority over nonmember lands only through an express delegation, would include the formulaic "notwithstanding" proviso— the gold standard for such delegations— in the narrower of the two sections, and then use an obscure and never-before-attempted formulation to accomplish the same result in the broader of the two sections.

*Id.* at 1302–03. The above reasoning applies to the instant case. Not only does the Settlement Act fail to include the "gold standard" of delegation in the form of the "notwithstanding" proviso, but the provision relied upon by the Tribe, unlike § 7601(d)(2)(B), does not even reflect on its face any congressional consideration of the proper scope of tribal authority. If § 7601(d)(2)(B) is accurately described as an "obscure and never-before-attempted formulation" for delegation, § 1300i–7's ratification and confirmation of tribal documents is obscurer still.

 Supreme Court precedent establishes the existence of a presumption against tribal jurisdiction over nonmembers: "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without *express* congressional delegation." *Montana*, 450 U.S. at 544, 101 S.Ct. 1245 (emphasis added). As *Montana* and *Strate* make clear, tribal jurisdiction over nonmembers is highly disfavored in light of the tribes' "diminished status as sovereigns." *Id.* at 565, 101 S.Ct. 1245. In light of this presumption against such ex-

traordinary grants of power, we believe it appropriate to adopt in this context a "clear statement rule": Congress can make express delegations of power to Indian tribes to regulate the actions of nonmembers, but because of the presumption against tribal jurisdiction over nonmembers, any such delegation must truly be "express." If Congress uses the "notwithstanding proviso," which is an easily invoked, Court-approved "gold standard" for delegation, then an appropriate delegation has been made. If a tribe claims that some other statutory language represents a conferral of jurisdiction, however, any such alternative language must, on its face, represent a pellucid delegation of the claimed authority.

█ Although the district court properly recognized that a statute's plain meaning is the starting and ending point for analysis in cases of statutory construction, its approach to interpreting the Settlement Act found plain meaning where none was to be found. The district court should have reviewed the claimed grant of congressional authority in light of the well-established background norms against which congressional delegations of authority to Indian tribes must be evaluated. These norms dictate that, when a tribe claims that Congress has delegated to it the authority to exercise jurisdiction over nonmembers, the claimed statutory delegation is subject to a clear statement rule. The provision of the Hoopa–Yurok Settlement Act relied upon by the Tribe—which contains no explicit authorization of jurisdiction, but simply incorporates by reference tribal documents that are themselves subject to varying interpretations—falls well short of the required standard.[5]

5. Much of Bugenig's argument on appeal is devoted to her claim that Congress, even if it had sought to do so, lacked the constitutional authority to delegate regulatory power over her land to the Tribe; such authority, she contends, properly belongs to the State of California under principles of federalism. In light of our holding that Congress did not intend nor effectuate any delegation of power to the Tribe through its passage of the Settle-

## III

█ *Strate* and *Montana* make clear that an Indian tribe may have the authority to regulate the conduct of nonmembers through either congressional delegation or inherent tribal authority. Having found no express congressional authorization, we must next decide whether the Tribe has inherent authority to regulate Bugenig's land under the *Montana* analysis.

█ In *Montana*, the Supreme Court set forth the "general proposition" that "the inherent sovereign powers of an Indian tribe *do not extend to the activities of nonmembers of the tribe.*" 450 U.S. at 565, 101 S.Ct. 1245 (emphasis added) (stating the "main rule" of *Montana* ). Noting the tribes' "diminished status as sovereigns," *id.,* the *Montana* Court pointed to two narrow exceptions to its general rule. Tribes may exercise civil jurisdiction over nonmembers when (1) nonmembers "enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; or (2) nonmembers engage in conduct on fee lands within a tribal reservation that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565–66, 101 S.Ct. 1245. Finding neither exception applicable, the *Montana* Court held that the Crow Tribe lacked the authority to regulate hunting and fishing by nonmembers on property located within Crow reservation boundaries but owned in fee simple by non-Indians.

█ The issue in this case is whether the Tribe's exercise of regulatory jurisdic-

ment Act, we express no view on Bugenig's constitutional challenges. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

tion over Bugenig's land through enforcement of the buffer zone can be upheld under the second *Montana* exception.[6] The Supreme Court, in *Strate*, explained the exception in the following terms:

> Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But [a tribe's inherent power does not reach] beyond what is necessary *to protect tribal self-government or to control internal relations.*" 450 U.S. at 564, 101 S.Ct. 1245.

520 U.S. at 459, 117 S.Ct. 1404 (emphases added). Following *Strate*, we have emphasized that "[a]lthough broadly framed, [the second *Montana*] exception is narrowly construed." *County of Lewis v. Allen,* 163 F.3d 509, 515 (9th Cir.1998) (en banc). In our unanimous en banc decision in *Allen,* we held that the Nez Perce Tribal Court lacked jurisdiction over a lawsuit brought by a tribal member against Idaho county law enforcement officers for false arrest, other torts, and a civil rights violation. Rejecting the tribe's argument for the exception's applicability based on the tribal interest in the safety of its members, we explained that "[u]nder the tribe's analysis, the exception would swallow the rule because virtually every act that occurs on the reservation could be argued to have some political, economic, health or welfare ramification to the tribe. The exception was not meant to be read so broadly." *Id.* at 515. Rather, when read "in its proper context," the exception allows for tribal jurisdiction only to the extent that such authority "is necessary to protect self-government or to control internal relations." *Id.* (quoting *Strate,* 520 U.S. at 459, 117

S.Ct. 1404 (quoting *Montana,* 450 U.S. at 564, 101 S.Ct. 1245)); *see also Montana Dep't of Transp. v. King,* 191 F.3d 1108, 1114 (9th Cir.1999) (explaining that "[t]he exception applies when to hold otherwise would threaten 'the right of reservation Indians to make their own laws and be ruled by them'" (quoting *Strate,* 520 U.S. at 459, 117 S.Ct. 1404)).

■ While Bugenig's logging of her land may well have some political, economic, or health or welfare implications for the Tribe, the dispositive inquiry is whether her logging threatens to "trench unduly on tribal self-government." *Strate,* 520 U.S. at 458, 117 S.Ct. 1404. While we acknowledge the cultural, social, and religious importance of the White Deerskin Dance, we cannot conclude that Bugenig's proposed logging is the type of activity that triggers the second *Montana* exception. The exception authorizes a tribe to do such things as punish tribe members, regulate their domestic relations and promulgate rules regarding tribal membership or inheritance within the tribe. *See id.* at 459, 117 S.Ct. 1404. These tasks are fundamentally different from a tribe's attempt to regulate a nonmember's use of her fee-owned land; regulating such land use, even when justified by reference to some tribal interest, simply does not implicate "tribal self-government" or "internal [tribal] relations" in the same direct way that the activities enumerated in *Strate* do. Under the Tribe's view of the exception, a tribe could effectively acquire general regulatory jurisdiction over nonmember land simply through asserting an interest in protecting various sites of claimed historical or cultural importance. The Tribe's interpretation of *Montana* would permit the exception to "swallow the rule"—the very outcome that we warned against in *Allen.* 163 F.3d at 515.

---

6. The parties agree that *Montana's* main rule controls if the second exception does not apply. The Tribal Supreme Court concluded that the first exception was inapplicable in light of the absence of any significant consensual relationship between Bugenig and the Tribe, and the Tribe does not challenge this holding.

■ Our conclusion that the second *Montana* exception does not give the Tribe jurisdiction over Bugenig's land is strongly reinforced by our decision in *Yellowstone County v. Pease*, 96 F.3d 1169 (9th Cir. 1996). In *Pease*, a member of the Crow Tribe invoked the second *Montana* exception to defend the jurisdiction of the Crow Tribal Court (which had ruled that he was not required to pay property taxes imposed by Yellowstone County). *See id.* at 1176–77. We were unpersuaded:

> [W]e reject Pease's argument that the Tribe has jurisdiction under the second *Montana* exception. Although he concedes that this action directly concerns *only his particular property,* he argues that the overall impact of the loss of land due to potential foreclosures could be devastating to the Tribe's land holdings and political integrity. This contention fails to establish a "direct effect on the political integrity, the economic security, or the health or welfare of the Tribe as a whole." As the Supreme Court has stated, "[t]he impact must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe."

*Id.* at 1176–77 (emphasis added and citations omitted). What *Pease* makes clear is that when determining the applicability of the *Montana* exceptions, we will not conduct an aggregation analysis.[7] *See id.; see also Red Wolf,* 196 F.3d at 1065 ("We do not doubt the truth of John Donne's observation that '[n]o man is an island.' . . . However, the Supreme Court has declined to employ this logic in conjunction with the second *Montana* exception."). Instead, we focus our attention upon the actual impact of the individual activity over which a tribe seeks to exercise jurisdiction.

As was the case in *Pease*, the litigation between Bugenig and the Tribe "concerns only [her] particular property." 96 F.3d at 1176. Accordingly, we do not consider "the overall impact of the loss of [forested] land due to potential [logging]," *id.*, but look only to the effect that Bugenig's logging of *her own* particular parcel might have upon the Tribe's political integrity. Under this analysis, we cannot say that Bugenig's logging fundamentally threatens the Tribe's ability to govern itself in any way. We are confident enough in the governmental strength of the Tribe to conclude that its political integrity would not be "imperil[ed]," as required under *Pease*, by a selective timber harvest on a parcel of less than three acres.

Furthermore, our precedents have stressed the inapplicability of the second *Montana* exception in situations where tribal jurisdiction "is not necessary to protect Indian tribes or their members who may pursue their causes of action in state or federal court." *Allen,* 163 F.3d at 516. This reasoning also applies here. California state law provides protections for certain Native American tribal resources. *See, e.g.,* Cal. Pub. Res.Code § 5097.9 (prohibiting state agencies from "caus[ing] severe or irreparable damage to any Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property, except on a clear and convincing showing that the public interest and necessity so require"). The Tribe's success in obtaining relief from the State of California, in the form of the revocation of Bugenig's logging permit, demonstrates that "[t]he absence of tribal jurisdiction does not leave the Tribe or its members without redress for nonmembers' alleged wrongs." *Red Wolf,* 196 F.3d at 1065.

7. Perhaps the most well-known example of aggregation analysis can be found in the Supreme Court's interpretation of the Commerce Clause in *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ("That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.").

Any lingering doubts as to the inapplicability of the second *Montana* exception are dispelled when the instant case is measured against our most recent application of the exception. In *Montana v. EPA*, 137 F.3d 1135 (9th Cir.1998), we upheld against facial challenge regulations of the Environmental Protection Agency allowing a qualifying Indian tribe to be treated as a state for purposes of promulgating water quality standards under the Clean Water Act. *See id.* at 1138. We did so in large part based upon precedent "recogniz[ing] that threats to water rights may invoke inherent tribal authority over non-Indians" due to the tangible and direct impact that such threats pose to tribal health and welfare. *Id.* at 1141.

This case is quite different. Simply stated, any arguable impact that cutting second-growth timber might have upon the holding of a tribal dance once every two years, at a site some distance away, "has no potential to affect the health and welfare of a tribe in any way approaching the threat inherent in impairment of the quality of the [tribe's] principal water source." *Id.* Returning to *Montana*'s emphasis

upon political integrity, to the extent that a government is legitimately charged with providing certain basic services to its citizens, it is difficult to imagine how serious threats to water quality could not have profound implications for tribal self-government. The same cannot be said of the situation here.

Finally, our recent decision in *Nevada v. Hicks*, 196 F.3d 1020 (9th Cir.1999), confirms the correctness of our conclusion as to the inapplicability of the second *Montana* exception. In holding that a tribal court had jurisdiction over state officials for tribal common law torts and certain federal and tribal civil rights claims, we emphasized that "the incidents underlying the instant case occurred on Indian-owned, Indian-controlled land, over which the Tribe retained its right to exclude nonmembers."[8] *Id.* at 1027. Surveying the relevant precedents of the Supreme Court and this court, we noted the strong connection between tribal power and the ownership and control of land. *See id.* at 1025–27. Because of this relationship, an Indian tribe's claim of jurisdiction is significantly strengthened when the events at

---

8. A tribe's "virtually absolute power to exclude" was crucial to the analysis of the separate opinion of Justice Stevens in *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 433, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (opinion of Stevens, J., joined by O'Connor, J.) ("[P]roper resolution of these cases depends on the extent to which the Tribe's virtually absolute power to exclude has been either diminished by federal statute or voluntarily surrendered by the Tribe itself."). As we have previously explained, the views expressed in Justice Stevens's opinion deserve careful consideration because Justice Stevens and Justice O'Connor were the deciding votes in *Brendale*. *See Hicks*, 196 F.3d at 1028 n. 9.

Unlike *Brendale*, this case involves no allegation of a near-total exclusionary power on the part of the tribe seeking to exercise jurisdiction. Thus, the holding of *Brendale* with respect to the Yakima Indian Nation's power to zone nonmember fee land located within the so-called "closed" area of the reservation simply does not apply here. Although the Tribe attempts to discount the significance of the Yakima Nation's right to exclude in *Bren-*

*dale*, the controlling opinion of Justice Stevens makes its importance quite clear. *See* 492 U.S. at 437, 109 S.Ct. 2994 (describing the difference between the "closed area" and the "open area" as one of "critical importance").

The Tribe stresses that the closed area in *Brendale*, like the area at issue in this case, was almost entirely owned by tribal members. Under *Brendale*, however, a high percentage of tribal ownership in an area is not enough by itself to trigger tribal jurisdiction. It is also necessary to make some showing that a tribe has reserved its right to exclude, since this power was precisely what gave the Yakima Nation "the lesser [included] power to regulate land use in the interest of protecting the tribal community." *Id.* at 433, 109 S.Ct. 2994.

Finally, it is important to note the fragmentation of the *Brendale* Court. In light of the Court's inability to settle upon a clear holding in *Brendale*, it is not surprising that *Montana* and *Strate*, which speak in clear terms and with a unified voice, have been far more influential in shaping the law of tribal jurisdiction in the lower courts.

issue took place on land owned and controlled exclusively by tribal members. Conversely, when a tribe attempts to assert regulatory authority over land that is owned and controlled by a nonmember, it confronts a nearly impossible task. This is because, under *Strate,* "tribes lack authority to regulate, and thus power to adjudicate, activities on land alienated to non-Indians." *Id.* at 1027; *see also Red Wolf,* 196 F.3d at 1064 (citing *Strate* for the proposition that "[t]ribal jurisdiction over nonmembers on land subject to *Montana*'s main rule requires express congressional authorization").

The main rule of *Montana* controls this case. Under *Montana, Strate,* and our cases construing those two foundational precedents, we are precluded from relying upon *Montana*'s exceedingly narrow second exception to find tribal jurisdiction over a nonmember's use of her fee-owned land.

### IV

In *Strate,* the Supreme Court set forth the following rule: "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." 520 U.S. at 445, 117 S.Ct. 1404. This language means just what it says: the congressional authorization must be "express," not inferred or implied, and the circumstances under which a tribe can exercise authority over nonmember conduct on nonmember-owned land are "limited" indeed.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.