Roberta BUGENIG, Plaintiff–
Appellant,

v.

HOOPA VALLEY TRIBE; The Hoopa Valley Tribal Council; The Tribal Court of The Hoopa Valley Tribal Reservation; Honorable Byron Nelson, Jr., Judge of the Hoopa Valley Tribal Court; Merv George, Chairman of the Hoopa Valley Tribal Council, Defendants–Appellees.

No. 99–15654.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 18, 2000.

Opinion Filed Oct. 3, 2000.

Rehearing En Banc Granted
Feb. 28, 2001.

Argued and Submitted June 19, 2001.

Filed Sept. 11, 2001.

James S. Burling, Pacific Legal Foundation, Sacramento, California, for the plaintiff-appellant.

Thomas P. Schlosser and K. Allison McGaw, Morisset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for the defendants-appellees.

Anne R. Traum, Appellate Section, Environment & Natural Resources Division, U.S. Dept. of Justice, Washington, D.C.; and Michael D. Beach, Faegre & Benson LLP, Minneapolis, Minnesota, for the amici curiae.

Before: SCHROEDER, Chief Judge, and HUG, FERNANDEZ, T.G. NELSON, KLEINFELD, SILVERMAN, GRABER, McKEOWN, WARDLAW, PAEZ, and BERZON, Circuit Judges.

Opinion by Judge GRABER; Dissent by Judge FERNANDEZ.

GRABER, Circuit Judge:

The issue for decision is whether the Hoopa Valley Indian Tribe (Tribe) has authority to regulate logging by a non-Indian on fee land that she owns, located wholly within the borders of the Tribe's Reservation, in order to protect tribal lands of cultural and historic significance. The district court held that Congress expressly delegated such authority to the Tribe. We agree, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin with a brief overview of the historical context in which the present question arises.

### A. *Establishment of the Reservation*

In the middle of the Nineteenth Century, numerous conflicts erupted between White settlers and Native Americans in northern California. As California grew, due in part to the discovery of gold, clashes between the White settlers and the tribes increased in frequency and severity, usually to the detriment of the Native American populations. In response, Congress determined that "the best policy was to set aside small tracts of land in the new state for the tribes," in order to protect them from the worst effects of settlement. *See Partitioning Certain Reservation Lands Between the Hoopa Valley Tribe and the Yurok Indians, to Clarify the Use of Tribal Timber Proceeds, and for Other Purposes,* S.Rep. No. 100–564, at 4 (1988) (Senate Report). In accordance with that policy, Congress enacted legislation authorizing the President to establish four Indian reservations in California. Act of April 8, 1864, 13 Stat. 39, *et seq.*

Pursuant to the 1864 Act, President Lincoln appointed Austin Wiley as Superintendent of Indian Affairs for the State of California. Wiley then issued a proclamation, which was subject to the approval of the President, establishing the Hoopa Valley Reservation on the Trinity River in Klamath County, California. *Short v. United States,* 202 Ct.Cl. 870, 486 F.2d 561, 563 n. 1 (1973) (quoting text of proclamation); *see also, generally* Byron Nelson, Jr., Our Home Forever: A Hupa Tribal History (1978) (providing a detailed history of the Hupa Tribe). The Reservation extended six miles on either side of a twelve-mile stretch of the Trinity River, up to the junction of the Trinity and the Klamath Rivers. The "Square," the common name of the Reservation, did not garner presidential authorization until 1876, when President Grant issued an executive order

approving Wiley's action. *Short,* 486 F.2d at 563 n. 3. As defined by President Grant, the Square consisted of 89,572.43 acres on an area of land populated primarily by the Hoopa Valley Tribe. *Id.;* Senate Report at 5–6.

Fifteen years later, in 1891, President Harrison issued an executive order enlarging the Square by adding a tract of land one mile wide on each side of the Klamath River, extending to the Pacific Ocean. *See generally Mattz v. Arnett,* 412 U.S. 481, 485–94, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (providing a detailed history of the Klamath River Reservation). The 1891 order created a single reservation by joining the Square with the Klamath River Reservation, which was populated mainly by the Yurok Indians but was not officially recognized as a reservation. The original Klamath River Reservation became known as the "Extension" or "Addition."

B. *Congress Changes Course: Allotment and Reorganization*

Contemporaneously with the events just described, Congress began to rethink its policy toward Native Americans. Instead of encouraging communalism and separatism through land grants to the tribes, Congress decided to encourage individual land ownership and, hopefully, eventual assimilation into the larger society. *Solem v. Bartlett,* 465 U.S. 463, 466–67, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). With that new goal in mind, in 1887 Congress passed the Indian General Allotment Act, 24 Stat. 388, codified at 25 U.S.C. § 331 (1887). That Act

> permitted the President to make allotments of reservation lands to resident Indians and, with tribal consent, to sell surplus lands. Its policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished. Unallotted lands were made available to non-Indians with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways.

*Mattz,* 412 U.S. at 496, 93 S.Ct. 2245.

The allotment policy did not have its desired effect; that is, in many respects it did not benefit Native Americans. Philip P. Frickey, *A Common Law for our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers,* 109 Yale L.J. 1, 14–15 (1999). One result of allotment was that large swaths of reservation land were lost from Indian control altogether, due to sales and tax foreclosures. Congress recognized this problem, so it reversed course and passed the Indian Reorganization Act (IRA) in 1934, 25 U.S.C. §§ 461–479, in which it proclaimed that "no land of any Indian reservation ... shall be allotted in severalty to any Indian." 25 U.S.C. § 461. The IRA was an "attempt to encourage economic development, self-determination, cultural plurality, and the revival of tribalism." Felix S. Cohen, Handbook of Federal Indian Law 147 (1982 ed.).

Section 16 of the IRA, 25 U.S.C. § 476, gave each Indian tribe "the right to organize for its common welfare, and ... adopt an appropriate constitution and bylaws," which were to be approved by the Secretary of the Interior (Secretary). The Tribe did so and, in 1952, the Secretary approved its constitution and bylaws.

Although the IRA was Congress' attempt to reduce the negative effects of allotment, Congress did not try "to undo the dramatic effects of the allotment years on the ownership of former Indian lands. It neither imposed restraints on the ability of Indian allottees to alienate or encumber

their fee-patented lands nor impaired the rights of those non-Indians who had acquired title." *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, 255, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). Thus, the policy of allotment shriveled some reservations; much property that once was under Indian control was sold off to non-Indians. Cohen at 137–38.

■ The Square emerged from this period mostly, although not completely, unscathed. That outcome was due, in part, to the government's unwillingness to commit to wide-scale allotment on the Hoopa Valley Reservation. Nelson at 153–58, 195–96. The court below, the Northwest Regional Tribal Supreme Court for the Hoopa Valley Tribal Court of Appeals, found that less than one percent of the Square's approximately 90,000 acres is presently owned by non-Indians.[1] *Bugenig v. Hoopa Valley Tribe,* No. A–95–020, 25 Indian L. Rep. 6139, 6141 (Apr. 23, 1998). This one percent includes the land that now is owned by Plaintiff Roberta Bugenig and is at issue in this case.[2]

C. *The Settlement Act*

Members of at least four different Native American tribes lived within the boundaries of the Hoopa Valley Reservation. Senate Report at 6. However, neither the 1864 congressional act nor the 1876 or 1891 executive orders, by their terms, granted any governing rights to any particular tribe. *Short,* 486 F.2d at 568. Despite that omission, throughout the Twentieth Century, the Bureau of Indian Affairs (BIA) governed the Reservation as if the Square were a reservation for the Hoopas and as if the Extension were a reservation for the Yuroks. Senate Report at 7. That distinction became important, because the Square was a source of substantial revenues from the sale of commercial timber, all of which was being divided among the Hoopas. *Short,* 486 F.2d at 562.

Not surprisingly, the Yuroks were dissatisfied with those financial arrangements. In 1963, they sued the Secretary of the Interior, challenging his decision to exclude them from sharing in the revenue from the harvest of timber grown in the Square. Ten years later, the Court of Claims agreed with the Yuroks' position. *Id.* at 561. The Court of Claims held that the executive orders and congressional acts described above established a single reservation for the benefit of all the Indians who were living within its boundaries. The federal acts did not vest in any particular tribe rights to the Reservation's natural resources, at least not to the exclusion of any other tribe that was living in the Hoopa Valley. *Id.* at 567–68. Therefore, the Court of Claims concluded that all the "Indians of the reservation" were entitled

1. Facts found by a tribal court are given deference unless they are "clearly erroneous." *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1313 (9th Cir.1990). The record contains a map showing that 2.8 percent of the Reservation is held in fee by "Indian and non-Indian owners," but it does not distinguish between the two. Plaintiff presented no evidence to contradict the tribal court's finding. Accordingly, we defer to the tribal court's finding.

2. The tribal court found that Plaintiff's property was allotted originally to members of the Hoopa Valley Tribe under the General Allotment Act. A twenty-acre portion, held in trust for Mae Wallace Baker, was converted to a fee simple patent in 1947, while another parcel, held in trust for Robert Pratt, was sold out of trust status in 1958 to Don H. Gould. Those parcels then became the property of a California Limited Partnership called the Gould Family Partnership, which sold them to Plaintiff in 1995. 25 Indian L. Rep. at 6141.

to the proceeds from the sale of the Square's natural resources. *Id.* at 568.

After *Short* was decided, several Yuroks filed another action against the BIA and the Hoopa Tribe, alleging that those defendants had "violated their rights to participate in reservation administration and to benefit from the reservation's resources." *Puzz v. United States*, No. C80–2908–THE, 1988 WL 188462, at *1 (N.D.Cal. Apr.8, 1988), *order vacated* Dec. 21, 1988 (dismissing as moot after passage of the Settlement Act). The crux of the Yuroks' complaint was that, although several tribes resided in the Hoopa Valley Reservation, only one tribe, the Hoopas, was allowed to administer it. As noted, the Hoopas had formed a tribal government in which non-Hoopa Indians were ineligible to participate. *Id.*

The district court agreed that the executive orders and congressional acts did not grant any territorial or political rights to the Hoopa Valley Tribe to the exclusion of other Indians living on the Reservation. *Id.* at *3. The court ordered the BIA to "exercise supervisory power over reservation administration, resource management, and spending of reservation funds, to ensure that all Indians receive the use and benefit of the reservation on an equal basis." *Id.* at *10.

Congress entered the fray in 1988 with the Hoopa–Yurok Settlement Act ("Settlement Act"). 25 U.S.C. §§ 1300i–1300i–11. In the Settlement Act, Congress sought to establish a "fair and equitable settlement of the dispute relating to the ownership and management of the Hoopa Valley Reservation." Senate Report at 14. Congress did so by partitioning the Reservation. The Square became the Hoopa Valley Reservation, with the "unallotted trust land and assets ... held in trust by the United States for the benefit of the Hoopa Valley Tribe," while the Extension became

the Yurok Reservation, with a similar trust arrangement for the Yurok Tribe. 25 U.S.C. § 1300i–1(b) & (c).

Congress also established a Settlement Fund and authorized the Secretary to prepare a roster of all persons who could be considered "Indian[s] of the Reservation" as discussed by the Court of Claims in *Short.* 25 U.S.C. §§ 1300i–3 and 1300i–4. Moreover, as part of its plan to define the rights of the parties involved in the Settlement Act, Congress stated:

> The existing govening [sic] documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary, are hereby ratified and confirmed.

25 U.S.C. § 1300i–7.

Congress provided that the partition of the Reservation, and the ratification and confirmation of the Hoopa Valley Tribe's governing documents, were contingent on the Tribe's adopting a resolution that (i) waived any claim that the Tribe otherwise might have against the United States arising out of the Settlement Act, and (ii) consented to the establishment of the Settlement Fund. 25 U.S.C. § 1300i–1(a)(2)(A). The resolution had to be reviewed by the Secretary and published in the Federal Register, both of which occurred. 53 Fed.Reg. 49361 (Dec. 7, 1988).

D. *The Present Dispute*

Article IX of the Tribe's Constitution provides that the governing body of the Tribe is the Hoopa Valley Business Council (Council). The jurisdiction of the Tribe is set forth in Article III: "The jurisdiction of the Hoopa Valley Tribe shall extend to all lands within the confines of the Hoopa Valley Reservation boundaries ... and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indi-

ans." One of the Council's enumerated powers, found in Article IX, section (*l* )(*l* ), is to

safeguard and promote the peace, safety, morals, and general welfare of the Hoopa Valley Indians by regulating the conduct of trade and the use and disposition of property upon the reservation, provided that any ordinance directly affecting non-members of the Hoopa Valley Tribe shall be subject to the approval of the Commissioner of Indian Affairs....

On January 28, 1995, pursuant to those constitutional provisions, and after a public notice and period for public comment, the Council adopted a timber-harvesting plan. The plan included a mitigation measure, adopted after consultation with the BIA, that was designed to protect certain sites of cultural significance to the Tribe. The plan established a one-half-mile buffer zone, where no timber could be harvested, around the White Deerskin Dance Ground. The White Deerskin Dance Ground is located on a trail that winds through the Reservation, and on a portion of the Reservation called Bald Hill. The prohibition against harvesting timber applied to "tribal trust land, trust allotments, and fee land within the ½ mile buffer." Decision of Hoopa Valley Tribal Council: Alternative for FY 1995 Timber Sale Program (Jan. 28, 1995).

The parties dispute somewhat the religious centrality of the White Deerskin Dance, although they agree that it is of significant historical and cultural importance to the Tribe. The Tribe describes the dance as "a world renewal dance." The Tribe also asserts that the Bald Hill dance site "is the most important dance site of . . . all dances that the Tribe has.... The site is very ancient. There's scientific evidence that indicates that it could be one of the oldest dance sites,

oldest ceremonies in the country." *Bugenig,* 25 Indian L. Rep. at 6139.

Shortly after the Council passed its timber-harvesting plan, Plaintiff purchased her property, which is located on Bald Hill within the buffer zone. Plaintiff applied to the California Department of Forestry and the County of Humboldt for a "timberland conversion" to convert approximately 2.5 acres of her land from timberland to pasture. The state granted the permit. Plaintiff then applied to the Tribe for a permit to haul logs over Reservation land. The Tribe denied the request. Nevertheless, Plaintiff sent the Tribe a check to cover the hauling fee, but the Tribe returned it to her. The Tribe also included a letter that explained the Tribe's position that, within the Square, "ONLY the Hoopa Valley Tribal Council has the authority to make land use changes."

Undeterred, Plaintiff began clearing timber, which she eventually hauled off her land. The Hoopa Valley Tribal Court issued a temporary restraining order and a notice of hearing. After the hearing, which Plaintiff declined to attend, the court issued a preliminary injunction enjoining her "from carrying out any timber operations" within the buffer zone. Shortly thereafter, the state revoked Plaintiff's logging permit, stating that "no timber operations are allowed on significant historical or archaeological sites [defined as] sites that have significant or religious importance to California Indians."

After another hearing, the Tribal Court held that the Tribe "has the power and authority to define areas of sacred significance and, through establishment of the buffer no-cut zone in the Bald Hill area, has exercised that power." *Hoopa Valley Tribe v. Bugenig,* C–95–020, 25 Indian L. Rep. 6137, 6138 (July 11, 1996). In support of its decision, the Tribal Court cited *Montana v. United States,* 450 U.S. 544,

101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The Tribal Court then found that Plaintiff had acted with "blatant disregard of tribal law." *Bugenig,* 25 Indian L. Rep. at 6138. Accordingly, the court issued a permanent injunction, which barred Plaintiff's logging activities in the buffer zone and ordered Plaintiff to undertake certain remedial measures respecting the trees that she already had felled. *Id.*

The injunction was affirmed on appeal by the Tribal Court of Appeals. That court held that the Tribe had acted pursuant to its inherent authority to regulate non-members' land in certain circumstances, and also pursuant to the express authority delegated to it by Congress in the Settlement Act. Plaintiff did not comply with the injunction. On October 11, 1996, the Tribal Court held her in civil contempt and ordered her to pay a sanction of $100.

Plaintiff then filed a complaint in the Northern District of California, seeking declaratory and injunctive relief. She argued that, because she is a non-Indian who owns her land in fee simple, neither the Tribe nor the tribal courts have regulatory or subject-matter jurisdiction over her land. The district court disagreed, holding that Congress, in the Settlement Act, had delegated authority to the Tribe to regulate all the lands within the Square, regardless of ownership.

Plaintiff filed this timely appeal.

## STANDARD OF REVIEW

■ We review de novo a district court's decision concerning the scope of a tribe's authority to regulate matters affecting non-Indians. *Ariz. Pub. Serv. Co. v. Aspaas,* 77 F.3d 1128, 1132 (9th Cir.1995). Additionally, the question whether Congress delegated regulatory jurisdiction to the Tribe in the Settlement Act involves the interpretation of a federal statute,

which we likewise review de novo. *United States v. Fiorillo,* 186 F.3d 1136, 1146 (9th Cir.1999), *cert. denied,* 528 U.S. 1142, 120 S.Ct. 991, 145 L.Ed.2d 939 (2000).

## DISCUSSION

### A. *The Analytical Framework*

At the outset, it bears repeating that certain important facts are undisputed: (1) The Square was created pursuant to an 1864 congressional act and an 1876 executive order; (2) the land that Plaintiff bought had become private property as a result of the operation of the 1887 General Allotment Act; and (3) in 1988, Congress partitioned the Hoopa Valley Reservation and ratified and confirmed the Tribe's governing documents.

Those facts are noteworthy because the Supreme Court has ruled that, after allotted land is conveyed to a non-Indian pursuant to the General Allotment Act, the Indian tribe loses "the right of absolute use and occupation of lands so conveyed" and no longer has "the incidental power to regulate the use of the lands by non-Indians." *South Dakota v. Bourland,* 508 U.S. 679, 688, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). The Court has observed that, although Congress eventually repudiated the policy behind the General Allotment Act, " 'it defie[s] common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction.' " *Atkinson Trading Co. v. Shirley,* 532 U.S. 645, 121 S.Ct. 1825, 1830 n. 1, 149 L.Ed.2d 889 (2001) (quoting *Montana,* 450 U.S. at 559 n. 9, 101 S.Ct. 1245).

This presumption against tribal jurisdiction over fee land owned by non-Indians within reservation boundaries is not absolute, however. The Supreme Court has set out three "limited exceptions" to the

general rule. *Id.* at 1828–29. First, a tribe can regulate non-members on non-Indian fee land that is within a reservation if that power is delegated to the tribe by Congress. *Id.* at 1830; *United States v. Mazurie,* 419 U.S. 544, 553–54, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). The other two exceptions come from an Indian tribe's retained, inherent sovereignty to (a) "regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" and to (b) "exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245; *see also Nevada v. Hicks,* —— U.S. ——, —— – ——, 121 S.Ct. 2304, 2309–10, 150 L.Ed.2d 398 (2001). These two exceptions are the so-called *Montana* exceptions.

In the present case, the district court held that the first exception was satisfied; Congress, in the Settlement Act, delegated authority to the Tribe to regulate Plaintiff's land. That is, even if the Tribe no longer retained inherent authority to regulate timber harvesting on non-Indian land within the Reservation's boundaries in order to protect cultural resources, the Settlement Act gave the Tribe authority to do so.

There is ample support for the general proposition that Congress *can* delegate jurisdiction to an Indian tribe. The Supreme Court has stated, repeatedly, that Congress can delegate authority to an Indian tribe to regulate the conduct of non-Indians on non-Indian land that is within a reservation. *See, e.g., Atkinson Trading Co.,* 121 S.Ct. at 1830; *Strate v. A–1 Con-*

*tractors,* 520 U.S. 438, 445, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997); *Bourland,* 508 U.S. at 694–95 & n. 15, 113 S.Ct. 2309; *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation,* 492 U.S. 408, 426, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (White, J.) (plurality opinion); *Montana,* 450 U.S. at 564, 101 S.Ct. 1245; *Mazurie,* 419 U.S. at 553–54, 95 S.Ct. 710.

Whether Congress *actually* delegated authority here is a difficult question, however, because the Supreme Court has discussed only rarely the concept of express congressional delegation. Indeed, the only opinion in which the Court has done so in any depth is *Mazurie. See* Cohen at 253 (noting the paucity of ·cases discussing Congressional delegation of jurisdiction to Indians).

At issue in *Mazurie* was a tribal ordinance that required every liquor store located within the Wind River Reservation to obtain a tribal liquor license. The Wind River Tribes had enacted the ordinance pursuant to a federal statute that prohibited the introduction of alcoholic beverages into "Indian country," unless it was done in conformity with both state law and "an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country." 18 U.S.C. § 1161. For the purposes of § 1161, "Indian country" is defined as "all land within the limits of any Indian reservation," but excluding "fee-patented lands in non-Indian communities or rights-of-way through Indian reservations." 18 U.S.C. §§ 1151, 1154(c).

The defendants in *Mazurie* owned a bar on private, non-Indian fee land within the boundaries of the reservation. The land did not fit the definition of the statutory exclusion because, although the land was "fee-patented," it was not in a "non-Indian community." *Mazurie,* 419 U.S. at 550–52, 95 S.Ct. 710. Defendants, who were non-Indians, were arrested by federal offi-

cers for operating their bar without a tribal liquor license and were convicted in federal district court. The Court of Appeals reversed the convictions, holding that 18 U.S.C. § 1161 was an invalid congressional attempt to delegate authority to Indian tribes. *Id.* at 550, 95 S.Ct. 710.[3] The Supreme Court reversed, holding that

> Congress has the constitutional authority to control the sale of alcoholic beverages by non-Indians on fee-patented land within the boundaries of an Indian reservation, and that Congress could validly make a delegation of this authority to a reservation's tribal council.

*Id.* at 546, 95 S.Ct. 710.

In reaching that conclusion, the Court first noted that Article I, section 8, of the United States Constitution grants to Congress the power to regulate commerce "with the Indian Tribes." *Id.* at 554, 95 S.Ct. 710. This clause, the Court observed, combined with Court precedent, leaves no "room for doubt" that Congress has the power to regulate the sale of alcoholic beverages to Indians and to regulate the introduction of alcoholic beverages into Indian country, even if the affected land is owned by a non-Indian and even if the person regulated is a non-Indian. *Id.* at 554–56, 95 S.Ct. 710.

Having determined that Congress possessed the power to regulate the defendants' land and business, the Court then analyzed whether this power could be delegated to the Wind Valley Tribes. The Court said "yes." Although there are limits on the authority of Congress to delegate its legislative power,

> [t]hose limitations are ... less stringent in cases where the entity exercising the delegated authority itself possesses in-

dependent authority over the subject matter. Thus it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory; they are a separate people possessing the power of regulating their internal and social relations.

*Id.* at 556–57, 95 S.Ct. 710 (citations and internal quotation marks omitted); *see also Rice v. Rehner,* 463 U.S. 713, 730, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (approving *Mazurie*'s holding after *Montana*); *Atkinson Trading Co.,* 121 S.Ct. at 1835 (citing *Mazurie* with approval).

*Mazurie* instructs that any determination that Congress expressly delegated to the Tribe authority to regulate logging on Plaintiff's land involves two distinct questions. *First,* we must be sure that Congress, in the Settlement Act, actually delegated regulatory authority to the Tribe. *Second,* if we conclude that Congress did delegate such authority, we must analyze whether that delegation was lawful. We answer each question in turn.

**B.** *Did Congress Delegate to the Tribe Authority to Regulate Logging Activities on Fee Land in Order to Protect Cultural and Historical Resources?*

The Tribe's delegation argument goes as follows: In § 1300i–7 of the Settlement Act, Congress stated that the "existing [governing] documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary, *are hereby ratified and confirmed.*" (Emphasis added.) That section, argues the Tribe, gave their 1972 Constitution, an

---

**3.** The Tenth Circuit also had held that the statutory definition of the term "Indian country" was impermissibly vague, a ruling that

the Supreme Court reversed. *Mazurie,* 419 U.S. at 552–53, 95 S.Ct. 710.

"existing [governing] document," the force of law.[4]

Article III of the 1972 Constitution states that the "jurisdiction of the Hoopa Valley Tribe *shall extend to all lands within the confines of the Hoopa Valley Reservation boundaries as established by Executive Order of June 23, 1876,* and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians." (Emphasis added.) Article IX, section (1)(*l*), states that the Hoopa Valley Business Council, the Tribe's "governing body," may regulate the *"use* and disposition *of property* upon the reservation, provided that *any ordinance directly affecting non-members* of the Hoopa Valley Tribe shall be subject to the approval of the Commissioner of Indian Affairs." (Emphasis added.) Therefore, the Tribe concludes, when Congress ratified and confirmed the Tribe's Constitution, Congress delegated power to the Tribe to regulate the use of all non-members' land that is within the boundaries of the Reservation, in certain circumstances.

In response, Plaintiff observes that the Supreme Court has ruled that any delegation of power to an Indian tribe to regulate a non-Indian must be express. Because the Settlement Act and the Tribe's Constitution are subject to varying interpretations, argues Plaintiff, they do not rise to the level of "express" delegation that the Supreme Court has required.

For the reasons that follow, we agree with the Tribe.

1. *In the Settlement Act, Congress "Ratified and Confirmed" the Tribe's Constitution.*

 As with all matters of statutory interpretation, we begin by examining the statute's text. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Title 25 U.S.C. § 1300i–7 states that the Tribe's governing documents are "hereby ratified and confirmed." It is notable that Congress used those terms of art. Black's Law Dictionary 1135 (5th ed.1979)[5] defines "ratification" as "the confirmation of a previous act[,] ... [t]he affirmance ... of a prior act ... whereby the act ... is given effect as if originally authorized." Similarly, "confirmation" is defined as to "give formal approval.... The ratification or approval of executive acts by a legislature." *Id.* at 270. Referring to the ordinary legal significance of the terms, when Congress "ratified and confirmed" the governing documents that were "heretofore recognized by the Secretary," Congress was authorizing, giving effect to, and formally approving the Tribe's 1972 Constitution.

The phrase "ratified and confirmed" has additional significance because it is the same phrase that Congress historically has used to give legal recognition to agreements between Native Americans and the United States. *See, e.g.,* Act of Feb. 28, 1877, 19 Stat. 254 (establishing that an agreement between the "Manypenny Commission" and the Sioux Indian Tribes was "ratified and confirmed"); Act of Mar. 3, 1891, 26 Stat. 1027, 1029 (establishing that two agreements between the Commissioner of Indian Affairs and the Coeur d'Alene Indian Tribe were "ratified and confirmed"); Curtis Act, 30 Stat. 495, 505 (establishing that an agreement between the Dawes Commission and the Choctaw and Chicksaw Tribes was "ratified and

---

4. The Tribe's 1952 Constitution was amended in 1972 and again approved by the Secretary.

5. We examine the meaning of statutory terms as of the date of the enactment in question, *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)—here, 1988.

confirmed").[6]

■ Furthermore, in 1988, Congress was well aware of the significance of the term "ratified," for the Supreme Court recently had held that an agreement with an Indian tribe is given the force of law when "ratified" by Congress. In *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975), the Court had to interpret a statute "ratifying" an agreement between the Colville Confederated Tribes and the United States. *Id.* at 198, 95 S.Ct. 944 (quoting 34 Stat. 1015, 1050–1051 (1907)). The question before the Court was whether a provision in the ratified agreement preempted a Washington state law. The Washington Supreme Court had interpreted the statute as *not* giving the agreement the force of law because the agreement was not a treaty. The Supreme Court disagreed, holding that, "[o]nce ratified by Act of Congress, the provisions of the agreements become law, and like treaties, the supreme law of the land." *Id.* at 204, 95 S.Ct. 944. We presume that Congress knew of this interpretation. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

■ In view of the usual meaning of the terms, their historic usage, and the Supreme Court's interpretation, the plain text of the Settlement Act establishes that, when Congress "ratified and confirmed" the Tribe's governing documents, it intended to give the Tribe's Constitution the force of law.

Our conclusion is buttressed by the legislative history, which makes clear that the Settlement Act was a response to confusion over who had the right to "make management decisions relating to the lands and resources of the 'Square' or, for that matter, the reservation as a whole." Senate Report at 9. The Senate Report explains that Congress' understanding of the law governing the Reservation was that, "absent statutory delegations," the Hoopas could not manage the Square. *Id.* The ratification and confirmation of the Tribe's Constitution was exactly that: a "statutory delegation[ ]" of authority to the Tribe to "make management decisions relating to the lands and resources of the 'Square.' "

The dissent argues that any delegation of authority to regulate non-members' land within the Reservation was not "consciously made" and hypothesizes that Congress' use of the words "ratified and confirmed" in § 1300i–7, when juxtaposed against Congress' repetition of those words in § 1300i–8, expressed Congress' intent to recognize the Tribe and the Yuroks as the "governing authorities of their respective reservations." (Dissent at 12917.) That forced parallelism will not withstand contextual scrutiny. The phrase "ratified and confirmed" cannot exist in isolation; it requires an object. Section 1300i–8 "ratifies and confirms" the Yurok Tribe's *status* "as an Indian tribe," a status that was previously unrecognized, while § 1300i–7 "ratifies and confirms" the Hoopa Tribe's "[governing] *documents.*" (Emphasis added.) As we have explained, the Hoopa Valley Tribe had a longstanding government, while the Yuroks had none.

But the fact that Congress used the words that it typically uses when it gives the force of law to a document involving an Indian tribe still illuminates Congress' intent.

---

**6.** The Settlement Act, unlike the congressional acts cited, "ratified and confirmed" a tribal constitution, rather than an agreement between the United States and an Indian tribe.

In sum, the natural reading of § 1300i–7—confirmed by its context and history—is that Congress was giving legal force to the Tribe's governing body and governing documents, and that is the reading that we give it. We turn now to the meaning of the Tribe's Constitution with respect to the use of fee lands within the Reservation.

### 2. *The Constitution Grants the Tribe Authority over Plaintiff's Land.*

■ The Tribe points to two provisions of its constitution that, it claims, give it regulatory authority over Plaintiff's land in order to protect the Tribe's cultural and natural resources: Articles III and IX(1)(*l*). We agree that the plain text of those provisions supports the Tribe's position.

Article III states that the "jurisdiction of the Hoopa Valley Tribe *shall extend to all lands within the confines of the Hoopa Valley Reservation boundaries as established by Executive Order of June 23, 1876,* and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians." (Emphasis added.) Article III is clear. The Tribe has jurisdiction over "all lands" within the borders of the Square.[7]

Plaintiff argues that the last clause of Article III, which refers to "such other lands," renders ambiguous the first clause, "shall extend to all lands within the confines" of the Reservation. Specifically, Plaintiff posits that, if the "other" lands that may be acquired later must be "acquired by or for the Hoopa Valley Indians," then the original lands referred to in the first clause also must be assumed to include only lands "acquired by or for the Hoopa Valley Indians" and thus must be

assumed to exclude fee lands owned by non-Indians.

Plaintiff's reading of Article III is labored; it gives too much weight to the word "other" and gives too little weight to the word "all." Article III's reference to "all lands within the confines of the Hoopa Valley Reservation boundaries as established by Executive Order of June 23, 1876," means the Square. "[O]ther lands" simply adds to the first clause—lands in addition to the Square, which may be acquired later by or for the Tribe.

Plaintiff also argues that the reference to "such other lands as may hereafter be acquired" must mean all land that the Tribe did not own at the time of the Settlement Act, including fee land such as hers. Under that interpretation, fee land does not qualify for inclusion in "all lands within the confines of the Hoopa Valley Reservation boundaries." To read Article III otherwise, she says, would be to make the second clause "surplusage."

That conclusion does not follow. The "such other lands" clause refers to a meaningful category of lands—lands outside the Square—that could be acquired later, but that do not fall within the category of "all lands" within the Square.

Our understanding of Article III makes perfect sense when it is read in the light of the overall historical context. The first clause of Article III refers to "*all* lands within the confines of the Hoopa Valley Reservation *boundaries as established by Executive Order of June 23, 1876.*" (Emphasis added.) At that time, there was no fee land yet checkerboarding the Reservation, because the General Allotment Act was not passed until 1887. Thus, our reading of the first clause gives meaning to

---

7. "Confines" means "border or limit; boundary." The American Heritage Dictionary 279 (1976).

the historical reference in Article III, while Plaintiff's does not.

Additionally, the Indian Reorganization Act authorizes the Secretary of the Interior to acquire land for Indians "within or without existing reservations," 25 U.S.C. § 465, and to "add such lands to existing reservations," 25 U.S.C. § 467. The second clause of Article III appears to be designed to foresee that contingency, extending tribal jurisdiction over any new lands so acquired.

In short, Article III provides that the Tribe has jurisdiction over "all lands" within the borders of the Square. We conclude that this assertion of jurisdiction includes Plaintiff's land.

The second provision on which the Tribe relies is Article IX(1)(*l*). Article IX sets out the "powers" of the Hoopa Valley Business Council. Section 1(*l*) grants the Council the power to

> safeguard and promote the peace, safety, morals, and general welfare of the Hoopa Valley Indians by *regulating* the conduct of trade and *the use* and disposition *of property upon the reservation, provided that any ordinance directly affecting non-members* of the Hoopa Valley Tribe shall be subject to the approval of the Commissioner of Indian Affairs. . . .

(Emphasis added.)

That provision unambiguously contemplates tribal regulation of the use of property upon the reservation, even if the regulation affects "non-members." Plaintiff acknowledges that Article IX(1)(*l*) refers to non-members as individuals, but notes that it does not refer to non-members' *fee* lands. Again, we are not persuaded.

Plaintiff's position is that fee lands owned by non-Indians do not count as

"property upon the reservation." [8] In view of our reading of Article III, however, we believe that Article IX(1)(*l*) plainly refers to all property upon the Square, whoever owns it.

Moreover, Plaintiff's reading of Article IX(1)(*l*) would make some of its provisions meaningless. The proviso that "*any* ordinance directly affecting non-members" is subject to approval contains no further limitation; that is, it assumes that any of the kinds of ordinances covered by Article IX(1)(*l*) could affect non-members. (Emphasis added.) Plaintiff's interpretation gives full force to the grant of power to regulate non-members' "conduct of trade" but would give no force to the grant of power to regulate non-members' "use and disposition of property." If the Tribe could not regulate non-members' fee lands, there would be no reason to provide for approval of ordinances that affect for example, non-members' "disposition of property upon the reservation."

Like Article III, Article IX(1)(*l*) is unambiguous. It states unequivocally that the Council can pass an ordinance that affects non-members and their lands, so long as the ordinance safeguards and promotes the peace, safety, morals, and general welfare of the Tribe and is approved by the Commissioner of Indian Affairs. An ordinance that is designed to protect a tribe's significant historical and cultural resources "safeguard[s] and promote[s] the peace, safety, morals, and general welfare" of the tribe. It is undisputed that the ordinance was approved by the Commissioner of Indian Affairs.

Under Article III and Article IX(1)(*l*), then, the Tribe had the power to pass the ordinance that affected Plaintiff's logging

---

**8.** Plaintiff does not argue that "property" refers only to personal property, rather than real property, and indeed Article IX(1)(*l*) would not support such a limitation.

activity on her fee land within the borders of the Reservation.[9]

### 3. *Read Together with the Tribal Constitution, the Settlement Act is an Express Delegation to the Tribe.*

Plaintiff argues that, even if the Settlement Act and the Tribal Constitution, read together, constitute a delegation of authority to the Tribe, it is not the kind of "express" authorization that the Supreme Court has required before a tribe may regulate non-Indian lands that are within a reservation's boundaries. *See Strate,* 520 U.S. at 445, 117 S.Ct. 1404 ("Our case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances."). We come to the opposite conclusion.

██ As the preceding analysis establishes, neither the Settlement Act nor the Tribe's Constitution contains any ambiguity. When Congress ratified and confirmed the Tribe's Constitution, Congress delegated authority to the Tribe to regulate all the lands within the Square, including that owned by Plaintiff.

 We presume, as we must, that Congress understood the contents of the governing documents that it ratified and confirmed. As the Supreme Court has taught, the argument that "Congress was unaware of what it accomplished or that it was misled by the groups that appeared before it" lacks force. *United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). "If this

test were applied literally to every member of any legislature that ever voted on a law, there would be very few laws which would survive it." *Id.* If the text of a statute is clear, as it is here, we must assume that "Congress intended what it enacted." *Id.*

Even if that presumption did not apply, the events surrounding the enactment of the Settlement Act show that Congress understood the scope of its delegation. As noted, the legislative history makes clear that Congress was under the impression that, "absent statutory delegations," the Hoopas could not "make management decisions relating to the lands and resources of the 'Square.' " Senate Report at 9.

The Tribe had been attempting to make such "management decisions" before Congress enacted the Settlement Act. In doing so, the Tribe took the position that its constitution enabled it to promulgate ordinances affecting non-members and their fee lands within the Square. For example, section 1.1.04 of the Law and Order Code of the Hoopa Valley Tribe, which was enacted in 1986, asserts that

> the effective area of this Code shall include all territory within the Hoopa Valley Indian Reservation, as defined by ... the Hoopa Tribal Constitution, including fee patent lands, allottments [sic], assignments, ... and existing and future lands outside the boundaries of the Reservation owned or controlled by the Hoopa Valley Tribe.

Similarly, the Comprehensive Plan for the Hoopa Valley Indian Reservation, adopted in 1973, grants the Tribe's government the

---

9. When Congress enacted the Settlement Act in 1988, the Tribe did not yet have *delegated* authority to regulate private land, notwithstanding the provisions of Article III and Article IX(1)(*l*). The Tribe may have retained *inherent* authority to do so, but we need not decide whether it had inherent authority. Even if the tribal assertion of jurisdiction over non-members' fee lands within the Reservation was *ultra vires* in 1972, Congress "ratified and confirmed" the Tribe's Constitution in 1988—that is, it validated and confirmed the Tribe's previous act.

power to "provide for assessments or license fees ... [of] all commercial ventures within the limits of the Reservation," while at the same time acknowledging that "95 percent of all commercial business services are owned by non-Indians and are located on former Tribal land." Hoopa Valley Indian Reservation Comprehensive Plan §§ 1.604, 1.608 (adopted June 21, 1973).

Moreover, it is significant that the ratification of the Tribe's Constitution was not self-executing. Instead, its implementation was contingent on actions that were to occur within sixty days after the Act's passage. Section 1300i–1(a)(2)(A) provided that the partition of the reservation and the ratification and confirmation of the Tribe's governing documents would occur only if the Tribe passed a resolution waiving claims against the United States and consenting to the Settlement Fund. The tribal resolution had to be approved by the Secretary and published in the Federal Register.

The Tribe passed the requisite resolution and had it approved by the Secretary and published in the Federal Register. The resolution sheds more light on the circumstances surrounding the Settlement Act. It stated, among other things, that the *Puzz* and *Short* cases had "crippled the power of the Hoopa Valley Business Council to exercise *the authorit[y] granted under the Tribe's Constitution ... to govern non-members.*" 53 Fed.Reg. at 49361 (emphasis added). With the Settlement Act, Congress expressly gave that authority to the Tribe.

■■■ After that resolution was published and approved, Congress amended the Settlement Act, *see* Pub.L. 101–301, but it did nothing to alter the Tribe's interpretation, which the Secretary had approved, and which had been duly published. "Although postenactment developments cannot be accorded the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose" of the statute. *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (citation and internal quotation marks omitted). When "an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *Id.* (citation and internal quotation marks omitted).

We acknowledge that the Settlement Act does not contain a detailed explanation, such as "we hereby delegate to the Tribe the power to regulate all lands within the Reservation, notwithstanding any patent owned by non-Indians." But no particular verbal formula is required.

■■■ On this issue, we agree with the District of Columbia Circuit's opinion in *Arizona Public Service Co. v. EPA,* 211 F.3d 1280 (D.C.Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001). There, the court responded to an argument that because Congress had, in the past, delegated authority to regulate non-Indians to Indian tribes by using the words "notwithstanding the issuance of any patent," any delegation that did *not* use these words could not be an express delegation of authority to regulate non members. The court disagreed and observed: "That a provision uses a new formulation is not dispositive of the question as to whether it constitutes an express delegation." 211 F.3d at 1289.

The Settlement Act is not ambiguous. When Congress ratified and confirmed the Tribe's Constitution, it gave that constitution the force of law. Neither is the

Tribe's Constitution ambiguous. It contemplates regulation of all land within the Square, in order to protect the general welfare of the Tribe, even if that regulation affects the use of lands owned in fee by non-members. In sum, when the Tribe passed the ordinance, it was acting pursuant to authority expressly granted by Congress.

### C. Could Congress Delegate That Authority to the Tribe?

Plaintiff's final argument is that Congress *could not* delegate such authority to the Tribe, even if it meant to. Plaintiff asserts that "there is no authority or precedent for finding that an Act of Congress can take regulatory jurisdiction over fee-simple non-Indian owned property away from a state government and give it to a tribe."

▓▓▓▓ Plaintiff has framed the question incorrectly, because her question assumes that state and federal jurisdiction cannot exist simultaneously over fee-patented land within a reservation. It is true that a state has some jurisdiction over fee-patented land within an Indian reservation. *E.g., County of Yakima,* 502 U.S. at 257–58, 268, 112 S.Ct. 683; Cohen at 352. It also is true, however, that federal jurisdiction reaches activities that occur on fee patented land within a reservation. *E.g.,* 18 U.S.C. §§ 1151, 1152; *Mazurie,* 419 U.S. at 555, 95 S.Ct. 710. Put differently, the want of state regulatory jurisdiction over land is not a necessary condition for federal regulatory jurisdiction over the same land. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142–43, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (explaining preemption law applicable to Indian reservations).[10] In fact, the Supreme

Court has suggested that *tribal* jurisdiction and state jurisdiction are not mutually exclusive. *See Brendale,* 492 U.S. at 440 n. 3, 109 S.Ct. 2994 ("The possibility that the county might have jurisdiction to prohibit certain land uses ... does not suggest that the Tribe lacks similar authority.") (Stevens, J.) (plurality opinion); *see also Confederated Tribes v. Washington,* 591 F.2d 89 (9th Cir.1979) (holding that tribal fishing regulations on waters within the Colville Reservation did not preempt state fishing regulations concerning the same waters).

Regardless, the question whether California may also have jurisdiction over Plaintiff's land is not before us; we are concerned only with whether Congress, in order to protect sites of cultural or religious significance to a tribe, can regulate timber harvesting on private property that is located within a reservation and, if so, whether it can delegate that power to the Tribe. The answer to both questions is "yes."

### 1. Congress has Plenary Jurisdiction over the Reservation.

▓▓▓▓ Congress' power over Native American affairs "is unusual in our federal system because it includes general federal authority to legislate over health, safety, and morals." Cohen at 219. It is "now generally recognized that the power derives from federal responsibility for regulating commerce with Indian tribes and for treaty making." *McClanahan v. State Tax Comm'n,* 411 U.S. 164, 172 n. 7, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (citing U.S. Const. art. I, § 8, cl. 3; U.S. Const. art. II, § 2, cl. 2). The Supreme Court

---

10. This principle is not unique to fee-patented lands within the borders of Indian reservations. The use of private property routinely is subject to regulation by both the federal and state governments.

has referred to Congress' power over Indian affairs as "plenary" and has noted that,

> "in the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them . . . needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic."

*Morton v. Mancari*, 417 U.S. 535, 552, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (quoting *Bd. of County Comm'rs v. Seber*, 318 U.S. 705, 715, 63 S.Ct. 920, 87 L.Ed. 1094 (1943)). Of course, the power of Congress in Indian affairs, although "plenary," is not absolute; it must be "rationally related" to the protection of Indians. *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 86, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977).

█ It is clear that Congress, exercising its plenary power over Indian tribes, could enact the ordinance in question and could regulate all the land within the Reservation that is owned by the Tribe or held in trust for the Tribe. *White Mountain Apache Tribe*, 448 U.S. at 145–46, 100 S.Ct. 2578. And we do not read the Supreme Court's cases as holding that Congress' plenary power to act on behalf of Native Americans necessarily ends at the border of allotted land, owned by a non-Indian, that is located wholly within a reservation. Rather, although the ownership status of land is one factor in determining the jurisdictional reach of the federal government, it is not dispositive.

█ As we noted earlier, the Court has held that Congress can delegate to an Indian tribe the power to regulate a private landowner whose property is located wholly within a reservation. *E.g.*, *Montana*, 450 U.S. at 564, 101 S.Ct. 1245. By necessary implication, it follows that Congress itself could regulate the same property in the first instance.

A more express version of that proposition is found in *Mazurie*, in which the Court noted that the federal government retains authority, under its Indian Commerce Clause power, to regulate the use of land within a reservation that is owned by a non-Indian, if the regulation—in that case, a regulation pertaining to the sale of alcohol—is meant to benefit the tribe. 419 U.S. at 555, 95 S.Ct. 710. Indeed, the Court in *Mazurie* upheld the constitutionality of 18 U.S.C. § 1151, which defines "Indian country," for purposes of federal criminal jurisdiction, as including fee-patented lands. *Id.* at 555, 95 S.Ct. 710.[11]

The Court in *Mazurie* was guided by two other cases, *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), and *Perrin v. United States*, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914). In *Seymour*, the Court held that the federal government had jurisdiction over a crime committed by an Indian on land patented in fee to a non-Indian. 368 U.S. at 358, 82 S.Ct. 424. In so holding, the Court reasoned that making criminal jurisdiction dependent on land ownership would create an "impractical pattern of checkerboard jurisdiction," which would be unworkable. *Id.*

Similarly, in *Perrin*, the Court held that the federal government could regulate the

---

11. Other cases have extended 18 U.S.C. § 1151 to include civil jurisdiction. *E.g.*, *DeCoteau v. Dist. County Court.*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

sale of alcohol on surplus lands that were *formerly* part of a reservation (as distinct from allotted land within a reservation), but now were owned by non-Indians. 232 U.S. at 486–87, 34 S.Ct. 387. The defendant argued that the federal regulation exceeded the power of Congress, but the Court disagreed. Congress did have the authority to protect the tribe:

> As the power is incident only to the presence of the Indians and their status as wards of the Government, it must be conceded .that it does not go beyond what is reasonably essential to their protection, and that, to be effective, its exercise must not be purely arbitrary, but founded upon some reasonable basis.

*Id.* at 486, 34 S.Ct. 387.

*Mazurie, Seymour,* and *Perrin* establish that, when evaluating a regulation· aimed at protecting a tribe, land ownership and tribal membership are not determinative of jurisdiction. More support for that proposition can be found in the legal doctrine that has developed around the "surplus land act" cases, in which the Court has attempted to define the applicable jurisdictional regime on unallotted surplus reservation lands that Congress opened to non-Indian settlement. Generally, the Court has instructed, the states have jurisdiction over unallotted surplus lands "if the applicable surplus land act ... diminished the reservation boundaries." *Solem,* 465 U.S. at 467, 104 S.Ct. 1161. By contrast, if a surplus land act "simply offered non-Indians the opportunity to purchase land within established reservation boundaries, then the entire opened area remained Indian country," including non-Indian fee land, and was subject to federal regulation. *South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (citation and internal quotation marks omitted).

In those cases, the Court has determined jurisdiction by examining the text of the surplus land act in question, as well as the historical context surrounding the act and the subsequent treatment of the land. *Id.* at 344, 118 S.Ct. 789. Notably, in *Solem,* the Court observed that, "[o]nce a block of land is set aside for an Indian Reservation *and no matter what happens to the title of individual plots within the area,* the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. at 470, 104 S.Ct. 1161 (emphasis added).

From that jurisprudence we derive support for the principle that federal jurisdiction within a reservation is not dependent solely on the ownership status of the land in question. Instead, following the cases described above, we must (a) examine whether Congress intended to divest itself of all jurisdiction when it authorized allotment of the Reservation, and (b) then determine whether the ordinance is necessary for the protection of the Tribe.

### a. Congress Retained Jurisdiction After Allotment.

We do not believe that Congress intended to divest itself of jurisdiction in this case. The Hoopa Valley Reservation, even after allotment, remains 97.2 percent intact. Less than one percent of the land is owned in fee simple by non-Indians. Again, reasoning by analogy to the surplus land act cases, when determining Congress' intent to divest itself of jurisdiction, "Congress's own treatment of the affected areas ... has some evidentiary value, as does the manner in which the [BIA] and local judicial authorities dealt with unallotted open lands." *Solem,* 465 U.S. at 471, 104 S.Ct. 1161. Here, less than one percent of the land is owned in fee by non-Indians, due primarily to the federal government's own unwillingness to authorize

large-scale allotment in the Square. *See* Nelson at 195–96 (summarizing the history of allotment on the Hoopa Valley Reservation). That unwillingness also is illustrated by Congress' failure to pass an allotment act that was directed *specifically* to the Hoopa Valley Reservation, as it did for several other reservations. *See Mattz*, 412 U.S. at 497, 93 S.Ct. 2245 (noting that "Congress occasionally enacted special legislation in order to assure that a particular reservation was in fact opened to allotment").

The Supreme Court's opinion in *Mattz* is especially instructive. There, the question for the Court was whether the Klamath River Indian Reservation (i.e., the Extension) was terminated by congressional act, or whether it remained "Indian country." The State of California argued for the former result. It reasoned that, although in 1891 the Extension was joined to the Square, in 1892 Congress passed an "act to provide for the disposition and sale of lands known as the Klamath River Indian Reservation," which opened the Extension to allotment to Indians and to homesteading by non-Indians. *Id.* at 494–95, 93 S.Ct. 2245. The 1892 statute, said the state, extinguished the entire Extension's "reservation status." *Id.* at 496, 93 S.Ct. 2245.

The Supreme Court disagreed. The Court noted that the 1892 act was similar to the 1887 General Allotment Act, in which Congress had established its intention "to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When *all the lands had been allotted* and the trust expired, the reservation could be abolished." *Id.* (emphasis added). The Court determined that the provisions of the 1892 Act "do not differ materially from those of the General Allotment Act of 1887" and, therefore, "*allotment* under the 1892 Act *is completely* consistent with continued reservation status." *Id.* at 497, 93 S.Ct. 2245 (emphasis added). The Court then stated that " 'when Congress has once established a reservation *all tracts included within it remain a part of the reservation* until separated therefrom by Congress.' " *Id.* at 504–05, 93 S.Ct. 2245 (emphasis added) (quoting *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909)).

▮ As we have noted, the Supreme Court also has held that land retains its "reservation status" after being ceded to non-Indians under a surplus land act and, thus, may be subject to federal jurisdiction. This is in contrast to a statute that diminished the reservation boundaries, leaving the non-Indian fee land outside the reservation. *See Yankton Sioux Tribe*, 522 U.S. at 333, 343, 118 S.Ct. 789 (evaluating whether a landfill was subject to federal environmental regulations by determining whether the land, which was owned in fee by a non-Indian, was still a part of the reservation, and concluding that it was not part of the reservation). The key to determining "reservation status" is Congressional intent. *Id.* at 343, 118 S.Ct. 789. And *Mattz* establishes that Congress meant for tracts of land within a reservation that were allotted pursuant to the General Allotment Act to retain their reservation status until all reservation lands eventually could be allotted and the reservation could be abolished. 412 U.S. at 496, 93 S.Ct. 2245.

▮ The foregoing analysis, combined with *Mazurie*'s holding that it is constitutional for Congress to regulate non-Indians' conduct on privately owned, allotted land within a reservation, leads us to conclude that Plaintiff's land—which is wholly within a reservation and which was allotted pursuant to the General Allotment

Act—remains subject to plenary federal jurisdiction.

It is true, as Plaintiff points out, that the Court has stated that it "defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction." *Montana,* 450 U.S. at 559 n. 9, 101 S.Ct. 1245. However, that statement was a reference to *a tribe's inherent authority,* not to the jurisdiction of the United States that may have remained after allotment. *Id.*

Moreover, even concerning a tribe's remaining inherent authority, the Court recently held that Congress "could not have intended," in enacting the General Allotment Act, "that tribes would lose control over the character of their reservations upon the sale of a *few, relatively small parcels of land.*" *Brendale,* 492 U.S. at 441, 109 S.Ct. 2994 (Stevens, J.) (plurality opinion) (emphasis added). In *Brendale,* the Court, in a fractured opinion, held that an Indian tribe retains authority to zone a non-Indian's fee land that is within a "closed" part of a reservation. *Id.* We believe that the same can be said of Congress' plenary authority over the Square. Congress could not have intended, after "the sale of a few, relatively small parcels of land," *id.,* to lose its power to pass regulations that protect the Tribe, including regulations that encompass the entire Reservation.

b. *The Ordinance Protects the Tribe.*

The ordinance in question, like the regulations in *Mazurie, Perrin,* and *Brendale,* is a rule of general applicability that is intended to protect "the internal and social relations of tribal life." *Mazurie,* 419 U.S. at 557, 95 S.Ct. 710. While Plaintiff has deconstructed the ordinance into a regulation that is only about cutting trees, we view it more holistically as a reasonable means to preserve and protect tribal resources that possess significant historical and religious value. We see no principled reason why the federal government can prohibit a non-Indian from selling alcohol on land that he owns in fee within a reservation, in order to protect the physical health of an Indian tribe, but cannot prohibit a non-Indian from using such lands so as to put the spiritual health of a tribe at risk.

We conclude, then, that the federal government did retain jurisdiction to protect the cultural and natural resources of the Reservation, despite the fact that land owned by non-Indians would be affected by such regulation.

2. *Congress Could Delegate that Authority to the Tribe.*

Finally, we must determine whether Congress could delegate that regulatory authority to the Tribe. Again, we look to *Mazurie* for our answer. There, the Court noted that, although there are "limits on the authority of Congress to delegate its legislative power," those limits are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." 419 U.S. at 556–57, 95 S.Ct. 710. Indian tribes, the Court observed, "are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Id.* at 557, 95 S.Ct. 710; *see also Atkinson Trading Co.,* 121 S.Ct. at 1835 (citing *Mazurie* with approval).

This case, like *Mazurie,* involves the regulation of a non-Indian's conduct on land owned by a non-Indian wholly within the boundaries of a reservation. As in *Mazurie,* the ordinance at issue affects "the internal and social relations of tribal life," a subject as to which the Tribe retains at least some independent authority.

419 U.S. at 557, 95 S.Ct. 710; *see also Brendale,* 492 U.S. at 441, 109 S.Ct. 2994 (holding that an Indian tribe retained inherent authority to zone land held in fee by a non-member in a closed area of a reservation); *Montana,* 450 U.S. at 566, 101 S.Ct. 1245 (noting that Indian tribes retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within the reservation "when that conduct threatens or has some direct effect on the. ... health or welfare of the tribe").[12]

Plaintiff also argues that Congress could not delegate regulatory power to the Tribe because she cannot become a member of the Tribe and therefore cannot participate in its government. The Court in *Mazurie* rejected a similar argument, noting that non-members were protected from arbitrary tribal conduct in at least two ways: (1) by 25 U.S.C. § 1302, which applies constitutional prohibitions to tribal governments; and (2) by the fact that the tribal ordinances had to be approved by the Secretary. 419 U.S. at 558 n. 12, 95 S.Ct. 710. The same is true here. Section 1302 applies to the Tribe and, pursuant to the Tribe's Constitution, any ordinance directly affecting non-members must be approved by the Secretary—as this ordinance was.

█ Because the Tribe possesses unique "attributes of sovereignty," and because the Tribe has at least some "independent authority over the subject matter" at issue, we hold that the federal government could delegate to the Tribe its authority to protect cultural and historical

resources of significance, "even though the lands were held in fee by non-Indians, and even though the persons regulated were non-Indians." *Mazurie,* 419 U.S. at 554, 557, 95 S.Ct. 710.

## CONCLUSION

We hold that Congress expressly delegated authority to the Tribe to enact the ordinance in question and that Congress had the power to do so.

AFFIRMED.

FERNANDEZ, Circuit Judge, with whom KLEINFELD and WARDLAW, Circuit Judges, join, Dissenting:

Because I disagree with the majority's holding that Congress has expressly conferred jurisdiction upon the Hoopa Valley Tribe over lands held in fee by non-Indians, I dissent.

In reaching this conclusion, I have given, as I must, the greatest deference to the Supreme Court's insistence that jurisdiction over non-Indians on non-Indian land is exceptional. That is because tribes have limited authority and jurisdiction over non-Indians. *See Atkinson Trading Co., Inc. v. Shirley,* 532 U.S. 645, 121 S.Ct. 1825, 1830, 149 L.Ed.2d 889 (2001); *Strate v. A–1 Contractors,* 520 U.S. 438, 446, 117 S.Ct. 1404, 1409–10, 137 L.Ed.2d 661 (1997); *Montana v. United States,* 450 U.S. 544, 549, 101 S.Ct. 1245, 1250, 67 L.Ed.2d 493 (1981). That limitation is surely proper and should be treated with respect, especially in light of the fact that if jurisdiction

---

**12.** The Court's reference to Indian tribes' "independent authority over the subject matter" is not an instruction for us to undertake a *Montana*-like analysis to see whether the Tribe actually retains inherent authority over Plaintiff's land. Instead, we read the Court to mean only that Congress can delegate to Indian tribes those powers that are within the

sphere of the Indian Commerce Clause—powers that are "rationally related" to the protection of Indians. *Del. Tribal Bus. Comm. v. Weeks,* 430 U.S. 73, 86, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). Congress could not, for example, delegate to a tribe the power to regulate commerce with foreign nations.

exists non-Indians will have no representation in the government or councils of the tribes, but will be subjected to the demands of a separate sovereign within the boundaries of the United States itself.[1] Thus, before finding that Congress has expressly authorized a tribe to assert jurisdiction over non Indians and their lands, the authorization should, in my view, be truly pellucid. We should not have to ferret it out in the midst of a fuliginous cloud of words. We should expect great clarity when Congress is ceding sovereignty to entities in which those who are affected will have no say. With that in mind, I turn to the issue at hand.

The original panel set out the issue in words that cannot easily be improved upon. I shan't try, but will instead rather extensively quote its language.

> The statutory provision at issue provides, in full, as follows: "The existing governing documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary, are hereby ratified and confirmed." 25 U.S.C. § 1300i–7.
>
> The fact that nothing in the Settlement Act itself explicitly confers upon the Tribe jurisdiction to regulate nonmembers raises serious questions as to how carefully Congress considered whether it was making any grant of regulatory authority to the Tribe. Moreover, the Settlement Act uses the same "ratified and confirmed" language to recognize the newly created Yurok Tribe, 25 U.S.C. § 1300i–8, which suggests that this language may simply represent Congress's attempt to establish

the Hoopa Valley Tribe and the Yurok Tribe as the governing authorities for their respective reservations, rather than a consciously made delegation of authority to the tribes to exercise jurisdiction over nonmembers. Indeed, legislative history makes clear that Congress's overriding concern in passing the Settlement Act was ending the acrimonious disputes between the Hoopa and non-Hoopa Indians living in the Hoopa Valley by creating two separate reservations, one for the Hoopa and one for the Yurok, in which each group would be free to govern itself without interference from the other. *See, e.g.,* 134 Cong. Rec. S13967–02, 1988 WL 177595, at *34 (Sept. 30, 1988) (statement of Sen. Inouye) (explaining the Hoopa Tribe's loss of its ability to govern the area that ultimately became its exclusive reservation); 134 Cong. Rec. H9406–01, 1988 WL 176807, at *35 (Oct. 3, 1988) (statement of Rep. Bosco) (explaining the Settlement Act as "lay[ing] the groundwork for strong, healthy tribal communities"). The legislative history contains no indication that Congress considered giving or intended to give the Tribe authority to exercise jurisdiction over fee-patented land owned by non-Indians such as Bugenig.

Despite this ambiguity with respect to the Settlement Act as a grant of power over tribal nonmembers, the district court interpreted § 1300i–7 as a congressional delegation of authority to the Tribe to exercise such jurisdiction. The district court reasoned that § 1300i–7's "ratified and confirmed" language works

---

1. As the Court recently noted: "Hitherto, the absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction; with one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers on non-Indian land." *Nevada v. Hicks,* —— U.S. ——, ——, 121 S.Ct. 2304, 2310, 150 L.Ed.2d 398 (2001). That, it seems to me, lays bare the fundamental fact that the scope of the jurisdiction asserted here is truly unusual.

to "give[ ] every clause in the document being ratified the full force and effect of a congressional statute." Turning to the Tribe's governing documents, the district court looked to Article III of the Tribal Constitution, which provides that the Tribe has jurisdiction over "all lands within the confines of the Hoopa Valley Indian Reservation boundaries as established by Executive Order of June 23, 1876, and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians." The district court held that "under the plain language of Article III, the Hoopa Valley Tribe has jurisdiction over Bugenig's land" as land located within the boundaries of the reservation.

*Bugenig v. Hoopa Valley Tribe,* 229 F.3d 1210, 1215–16 (9th Cir.2000) *(Bugenig I).*[2]

As I see it, the district court was surely wrong when it determined that the language in question clearly conferred jurisdiction over non-Indians on non-Indian land within the boundaries of the reservation. There is not a whisper of that in the language in question; nor is there any reason to think that Congress divined that intention lurking in the words. To assume that jurisdiction means a general plenary jurisdiction over others and that all we need to do is ruminate on its territorial scope is to beg the question.

As it is, there is nothing remarkable about a tribal constitution's declaration that the reach of tribal authority will extend to its own boundaries, and that is all the language at hand declares. That is a far cry from saying that the tribe will have unrestricted authority to regulate the use of non-Indian land within those boundaries, regardless of the fact that a tribe generally has no such powers. Still, there are occasions when a tribe is empowered to regulate others, even without an express conferral of jurisdiction by Congress. The Supreme Court said as much before this tribal constitution was ratified by Congress, and Congress must have been aware of that. I speak, of course, of the so-called *Montana* exceptions. *See Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1258. Those exceptions have been carefully circumscribed. *See, e.g., Atkinson Trading,* 532 U.S. at ——, 121 S.Ct. at 1832–35 (2001); *County of Lewis v. Allen,* 163 F.3d 509, 515 (9th Cir.1998). Nonetheless, the exceptions do exist, and a tribe whose jurisdiction does not extend to non-Indian land when they do exist might well find that it could not " 'protect tribal self-government or … control internal relations.' " *Atkinson Trading,* 532 U.S. at ——, 121 S.Ct. at 1835 (2001) (citation omitted). In that sense, then, it is perfectly reasonable to believe that when the Tribe drafted its constitution, it intended to reach out and accept all jurisdiction that properly belonged to it, but there is no reason to believe that Congress read the constitution's bland language as a power grab over land and peoples not related to the Tribe itself or to its government. The Tribe simply could not authorize itself to do that. We should not act as if it could, or as if Congress thought that the Tribe had tried to do so and then ratified the attempt. Nor should we decide that by using the constitution's unexceptional language the Tribe, like a retiarius, ensnared and skewered Congress, thereby obtaining exceptional jurisdiction.

---

**2.** The district court also pointed to Article IX, § 1(*l*) of the constitution, which allows regulation of trade and the use and disposition of property, if the Commissioner of Indian Affairs approves of it. However, as the panel pointed out, that language appears to do no more than allow for regulation of "consensual commercial dealings between tribal members and nonmembers." *Bugenig I,* 229 F.3d at 1216.

I would, therefore, hold that the language in question, even coupled with the ratification statute, was not an express conferral of additional authority or jurisdiction, but, rather, a mere confirmation of the general jurisdictional rights that every tribe must have.[3]

That being said, I see no real need to explore the outer limits of the meaning of express authorization. Wherever they may be, the language of the tribal constitution did not reach them. The panel found a mere ambiguity in the language. *Bugenig I*, 229 F.3d at 1216–17. With all due respect, I believe that in doing so it conceded too much. Because it did, however, the panel felt the need to press on. I consider that to be a divagation, but to those who are interested in exploring the subject, I commend the panel's discussion. *See id.* at 1216–19.

Once the express authorization issue is resolved as I have resolved it, the next question is whether the Tribe's desire to protect the area in question is sufficient to bring its assertion of regulatory power over non-Indian lands within the *Montana* exception for "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258. As the Court has told us, that would require that the impact of the non-Indian conduct was "demonstrably serious" and regulation was necessary to "protect tribal self-govern-

ment or to control internal relations." *Atkinson Trading*, 532 U.S. at ——, 121 S.Ct. at 1835 (2001) (citations and internal quotation marks omitted). The district court did not really explore those issues which are, to say the least, fact intensive. Thus, I would remand this case so that the district court could further develop the record and decide in the first instance whether the exception does apply.

In sum, it seems plain to me that the Hoopa Valley Tribe's constitution could not, and did not, reserve or confer upon the tribe what it did not have and could only obtain through a separate express gift from Congress—plenary jurisdiction over other peoples' lands. It seems equally plain that on its face the constitution did no more than reserve all of the jurisdiction that it could reserve—jurisdiction over tribal lands and, in special circumstances, jurisdiction over non-tribal lands as well. So plain it seems, it would take a marvelous act of interpretation, bordering on thaumaturgy, to read the constitution as expanding the Tribe's jurisdictional reach beyond the norm. There is no reason to believe that Congress did so.[4]

Thus, I respectfully dissent.

---

**3.** Incidentally, when the provision in question is read as a whole it can also be seen as an express limitation of jurisdiction to land that is held "by or for the Hoopa Valley Indians." That is, when it refers to "other lands" acquired "by or for" the Indians, implicit in that is the thought that the words "all lands within the confines of ... Reservation boundaries" also concerns those that are "by or for" the Hoopa Valley Indians. I eschew that reading, however, lest it foreclose tribal jurisdiction

under circumstances when the *Montana* exceptions would allow it.

**4.** Because my framing of the nature of the problem may mislead some regarding my position, see for example the majority opinion at 1213–14, let me be, perhaps redundantly, explicit. I would not hold that an inattentive or ill-informed Congress misunderstood the plain meaning of its own enactment, or the proper reading of the provisions of the tribal constitution. I would hold, instead, that the

plain and proper reading of the tribal constitution is what I have already indicated, and that Congress must be deemed to have understood just that, rather than the creative reading now pressed upon us.